Good morning, Your Honor. Estella Riqueda appearing on behalf of Petitioner Mr. Muyenga. Your Honor, if it pleases the Court, I'd like to reserve a minute for rebuttal. All right. Your Honors, the – I'd like to concentrate, first of all, on the issue that was brought to both the Petitioner and the Respondent by this Court, and that is addressing the case of Yemeni concerning – as it applies to our case. Okay. And then I will also address the issues of the standard of review that the Court used in arriving at its conclusion. Okay. The Yemeni case, as I understand it, dealt with the counterfeit document, and in that case, the Court found that the document by itself is not the basis for an adverse ruling on credibility. It also concerned itself with other factors as to how to arrive at the ruling of credibility. In our case, the fraudulent document concerned a newspaper article about the Petitioner's activities and the fact that he had disappeared in his activities with the Uganda Youth Democratic Party. The court – the immigration court then analyzed that since this article had been reviewed by an expert and found that the article in that expert's opinion was not legitimate, the court then found that that was one of the prevailing factors that they concluded that there was no credibility of – Counsel, the forensics expert says that the article has been added to the newspaper, that it was not part of the original newspaper. Now, did the forensics expert conclude that – in any way that the article itself had not come from some other newspaper? No, Your Honor. Okay. Did you ever identify another newspaper where it came from? No, Your Honor. We did not. So as far as we know, what we have is we have something that appears to be a newspaper clipping that has been pasted over another newspaper and tried to pass off as part of the original. That's correct, Your Honor. And the Petitioner was questioned extensively during the hearing as to how that article came to be paced or appeared to be paced on the newspaper. And he said that in his country, he had known that if – he called it stop the press, that if there was a article or a story that was pressing, they would stop it and just pace it on. He did acknowledge that it did appear to be paced. He acknowledged that – Now, is that all he was able to produce was a Xerox copy of a newspaper? Or is there someplace, some record around here that's got an original showing in newsprint? Your Honor, I do not know that, Your Honor. It doesn't seem likely that a newspaper would literally paste something onto every copy, would it, even if you had a stop the press? It would explain the typos that are in there, that if somebody was hurrying to get something out, although it doesn't really seem like this would be the kind of article that one would stop the presses for. Your Honor, this was apparently a newspaper that was in favor of the party that he represented. And certainly his explanation was that they – it was his experience that they did stop the press for that. And he did try to explain it. He did also explain the fact that it did – you know, the testimony was how did – did you verify this article? Did you call your uncle? Because apparently the uncle purportedly – The uncle was in Uganda, is that correct? That's correct. Okay. And the uncle in Uganda purportedly gives it to a woman named Grace who is coming to the United States to attend her brother's graduation. That's correct, Your Honor. And – but Mr. Muyunga tells two different stories as to how he gets the article. In one account, he is there when Grace comes to the apartment. In the other, he is not there when Grace comes to the apartment. So we have some problem as to how we get – as to how we physically get this article. We've told two different stories, is that right? That is correct, Your Honor. On the record, I think that that was the only inconsistency as it concerned the article. But he did try afterwards to call the uncle to verify how the uncle came to have possession of the article and certainly how the article – Did anybody make any attempts to get a second copy of this article or an original out of some files in Uganda? Not to my knowledge, Your Honor. Not the expert that reviewed the article. In light of your meaning, what would you like us to do with this article and the discrepancies about how Mr. Muyunga came to possess the article? Well, the discrepancies – one time he said it was – I think it was delivered. Another time he said he was there, huh? Yes. The discrepancy about the article and how it came to be. What did he say? I didn't think it was that big a discrepancy. That was the only discrepancy concerning the article. Once he – it came to his attention that there was some suspicion about the article. In fact, he states that in the record. He did try to verify the article, and he called the uncle, and the uncle had to hide. But I'm – no, I'm asking you about the discrepancy and how he got the article. Yes, Your Honor. Your statement of how he got the article and the discrepancy is correct. That he – the discrepancy is that at one time he did say that he was present when this woman, Grace, brought the package that contained the article. And I believe later on in his testimony he said he was not present, that a roommate received the package for him. So in one story then, he saw and met Grace, and she physically gave him the article. And in the other one, he's not there. That's correct, Your Honor. What are his words? Do you have the language? Yes, Your Honor, I do have the language. And I believe I'm referring to page 100 – 202 – 201 of the administrative record. All right. So what does he say? It says, how did you get this? That's the question. I found the paper at home with my roommate – with my roommate then – by then. She told us a lady brought it and asked for me, and then she said she has got a letter from home. And then she left the letter there. Then I opened it, and I came to – I received the letter and opened it, and then there was this newspaper. So there was a letter in it? No, there was no letter, just the newspaper. When I opened it, I found – and then there's something that's not audible. So I was so excited, I brought it to you the following day to you, and he's speaking to his attorney. So he had it for a day, then he took it to his attorney. Did you ask anyone back home to get this newspaper article? Yes, before my uncle died. I told him after the asylum interview. So that's the part about delivery there. Right. That's contradicted by pages 154 and 155. Yes. How did you come to meet this lady? Okay, I was at my apartment, then somebody knocked at the door, and they said, I have got some letter for you, something from Uganda. Were you told that this lady was there to give you something? No, it was a surprise. And what was her name? Grace. Did she say where she was from or where she was staying? Was she from Uganda? Yes. Did she say when she arrived here from Uganda? All I know is she came to celebrate one of her sister's graduation, no brother's graduation. And he responds later on on page 156, yes, she told me. So we've got some fairly specific details here that she spoke with him, told him her name, where she was from. And yet elsewhere in the record he says, I'm not home when she comes by. Yes, Your Honor, we do have that discrepancy. The record, I don't believe that discrepancy in the record, though, is sufficient to. Well, the question of how he came by the newspaper might not be all that important, except that this newspaper will corroborate a report that there were three members of the UDY that were kidnapped. Two of them appear in this proceeding, Mr. Muyunga and his friend Domiano, who tell almost precisely the same story, and Domiano has already been granted asylum. There are two inferences that one can draw from that. One is that they tell the same story because they were captured at the same time and suffered the same torture and punishment in Uganda, as the article demonstrates. And the article would confirm that they were kidnapped at the same time. The other is that this is a copycat asylum claim, and that's the government's position or its theory, that Mr. Muyunga simply copied from his roommate his story because it was a successful one. Excuse me. That could be an assumption, Your Honor. That is not the position of the petitioner. And I believe that there's a lot more evidence in the record that needs to be assessed and evaluated before one would come to a conclusion solely on the newspaper article and the discrepancies concerning the delivery of the newspaper article. The problem is that, except for his friend's testimony, everything he offers depends upon his own testimony. And if he can't be believed with regard to something that's fairly simple and straightforward, why can't the I.J. fairly say that he lacks credibility and he can't be believed for everything else as well? And what's wrong with that determination? Well, Your Honor, according to the standard of review that the I.J. needs to consider, it's not just the fact that just the story about the simple newspaper, but he also offered a letter that contained the same information as a newspaper article. And there was no ---- But he's the authenticating source for the letter. Pardon? He's the authenticating source for the letter. He's the one that offers it. Yes, Your Honor. So if he can't be believed about the newspaper article, why should he be believed about the letter being authentic? Well, Your Honor, he is ---- he offered the letter itself, that he was a member of the Uganda Youth Democratic, and that ---- and he did offer it. But, you know, the court and the government could also have gone ahead and questioned that as well. They didn't. In fact, the judge in his decision states, it is presumed that there's a fantasy to this. So that particular document was not in question. The other thing, too, Your Honor, is that Yamani goes into the fact of whether he knew that the article itself, before it was produced, did he have some knowledge that it was fraudulent. And he was asked this during the record, and he stated that he didn't know. That, you know, he asked his uncle for the article, and his uncle just sent that to him. Afterwards, he was trying to verify the authenticity of that article. So he was asked directly whether he knew, and he states that he doesn't know. But he was inaccurate about how he came to have the article. So how are we supposed to know whether he's accurate about everything else? Your Honor, I believe that the rest of the record would help the evaluator of the facts and, you know, And I think there is. I mean, there was the document that the court conceded that had authenticity. And then there was the testimony. There was his testimony, and his testimony was extensive as to what, as to his asylum claim. It was extensive as to the questioning of this particular article. And then there was the corroboration of the article, of the one document that was found authentic. And by his witness and, you know, and the events that happened to him, the torture, the imprisonment, all that was corroborated. Certainly you mentioned before, Your Honor, that there was similarity in their cases. And the article would offer an explanation for that. There's no question. Mr. Muyunga tells a horrific, horrific story. And it is one that we have all, that the government has already heard once before from Domiano. And the article would offer an explanation for that, wouldn't it? Because it would say these two men were among three members of the party who were kidnapped at the same time and are missing. So it would offer an explanation as to why they would have similar stories, because they were kidnapped at the same time. It offers a story as to their kidnap and that they belong to the party. It does not offer a story as to, you know, as to what happened, the details of what occurred to Mr. Muyunga, how it occurred, you know, how many days he was in prison, how many days he was in jail, what exactly happened to him, how he came to encounter, you know, Mr. Kigolbe. So it doesn't offer all that. It's just, you know, a very short article. So it doesn't go into everything. And if the record was more detailed, and it is detailed, it does show that there are some dissimilarities in the testimony of Kigolbe and Mr. Muyunga. I mean, because everything is not exact point by point. Certainly the main stories, there are similarities. But even the days when they were in the military training, one versus the other, it's not the same. The form of the torture by the snakes is not the same. So there are similarities, and they just happen to be in the same camp. They belong to the same political background. So, yes, their stories are similar. But that is an argument and an evaluation that should go towards finding credibility and not against it. And certainly it's, you know, it's how the evaluator of the evidence looks at it. So that is, and that is for Yemen. They look at the fact that it's not just the particular article that should have the weight and all of the credibility, and that they have to see whether he knew of the fraud. He did not know of the fraud. They also go into whether there's other corroborating evidence. And here there is other corroborating evidence. Did the immigration judge make a finding that he knew or should have known that the article was not authentic? No, Your Honor. They did not make that finding at all. Also, when it, the judge also went into. I just have to tell you this. I look at this Xerox copy. It looks pretty good to me. I wouldn't, I don't, it all seems to fit. But you've got an expert on question documents that said that it was inserted there. And, you know, there are misspellings, but New York Times has got about, you know, four inches that cover the whole second page where they apologize for their mistakes and misspellings of the previous day. I agree with Your Honor. Just one more point, Your Honor. The judge also mentioned that the petitioner's demeanor, as far as he considered the petitioner's demeanor in assessing the credibility as well, that he halted when he answered. But he didn't detail, he wasn't specific as to what particular times during his testimony he halted, why that would have such a significance of overcoming the ruling in favor of credibility. So he just made conjecture and speculation also on the fact that the testimony of his witness, Mr. Kobabi and Muyengas, was similar, that that similarity, you know, pointed to him that the stories were concocted. And I believe, and he doesn't show anything in the record, he doesn't specify anything in the record, that that's how he came about his decision. There was just statements that the Court made. All right. Thank you. Thank you, Your Honor. This is the O.S. 1132nd. So next time you argue here, we'll take that. Yes, Your Honor. This is my very first time.  You've got some passion towards the end. Thank you, Your Honor. Thank you for what we need. Morning, Your Honors. Melissa Meister for the Respondent and Attorney General of the United States. This case is different from Yemeni verhi, and I'm going to tell you three reasons why it's different. The first is, in Yemeni, you had nothing else. The Court found that there was nothing else in the record to suggest that the Petitioner was not credible. As Your Honor pointed out, in this case, there's a lot of testimony to suggest the Petitioner is not credible. On pages 145 to 157 of the record, Petitioner testified that a lady named Grace, whom he knew from Uganda, came by his house, knocked on his door while he was there, handed him the newspaper personally, and said that his uncle had given it to her so that she could go to her sister or brother's graduation and drop it off on the way by. He then testified that he called his uncle. His uncle picks up the phone and says, yes, I sent you the paper. Later, on pages 201 to 202 of the record, he testified to a completely different exchange. In that one, he said that a lady came by when he was not at home, gave it to his roommate, Arthur. When he came back, he didn't know who had given it to him, thought it might be his uncle, called his uncle and found out his uncle had died. So you have three inconsistencies. In one story, his uncle's alive. In another one, his uncle's dead. In one, the lady he knew named Grace comes by. In another one, he doesn't know who the lady is that came by, except that his roommate, Arthur, told him. And also, he's either there or he's not there. This is in addition to, obviously, as the IJ said, an obviously fraudulent document. He did make a finding. He said that it was clear that it was fraudulent to the, quote, naked eye, unquote. And he also said that it clearly looked like it had been superimposed. Did he say that he knew or should have known the article was not authentic? He did not specifically say that he knew or should have known. Frankly, when I looked at it, it looked all right to me. There are two different reproductions in the record, if I remember correctly, one which had been superimposed with another page and one which had some clarity, but the text was a little bit different. So we don't have the original on the record. I was not able to find it. I'm assuming that the original displayed the text. The IJ comments that it appears that the article has been cut out and superimposed over another article because it's blocking a photograph. And there's also text underneath. Yeah. That he mentions that it looks like it had been pasted over, which is what makes this case similar to the Sixth Circuit's decision in Salami v. Gonzales, where in that case, the Sixth Circuit found the submission of the forged document that was obviously fraudulent was sufficient to support an adverse credibility finding. In that case, a father had given it. In this case, it's an uncle. And the Sixth Circuit said it still supports the finding because the document was obviously fraudulent and the petitioner did not question the document. And that's another difference between this case and Yemeni. In Yemeni, you had a medical certificate, and the INS had to deconstruct the rubber stamping on it and say that it had been copied too many times. And so, therefore, they said that Yemeni had no reason. We don't have the document that went into evidence. We don't have. There's no original document in evidence. And in that case, I believe that this Court must rely on the IJ's first impression of the document and give deference to his finding that it was to the naked eye superimposed over another article and picture. It looks like there's two problems. One is that it appears that you've got a bottom half of a page that's been pasted over top of a top half of a page, perhaps to pick up the date and the identity of the newspaper. The second is that it appears that even the smaller article, Young Democrats Go Missing, has been cut and pasted onto the page. It appears we've got an article on top of a page on top of a page. And the IJ does comment on that. But nobody knows where the original is? Nobody knows where the original is, Your Honor. Well, the original of what? The original of the paper. In Salami, the IJ in that case sent the paper to the Library of Congress and got back the original to prove consistently that the article is not the original. In this case, the IJ did not do that. There's no evidence from the Library of Congress as to what the original paper might have said. We simply have Sometimes, you know, you want to Xerox an article, and there's a kind of a piece that's maybe on another page or whatever, and you can sort of fold that over without cutting the paper and taking a copy of it. And one of my law clerks is very good at this. He figured this all out. He's probably better at it than I am, Your Honor. Well, he's better at the Xerox machine than I am, too. But in this case, Your Honor, you have not only this, which the IJ said was clearly superimposed. What does the country report tell us about Uganda? The country report, which the IJ didn't consider, nor the BIA considered, suggests that Uganda does have some human rights violations against opposing political parties. In this case, the IJ did not consider? The IJ, in his decision, the IJ did not say he considered the country report. He also did not consider whether he was actually persecuted on account of his political opinion, which is another problem that this case might have. He said he was a young Democrat. Correct. He said he was a young Democrat, and the petitioner mentioned that he had a corroborating letter from the Ugandan young Democrats, which does corroborate that he was a young Democrat, but it stated on August 15th and said that he went missing, quote, almost a year back. Well, almost a year back was September 24th, 1999, when he came into this country. So the only thing that letter corroborates is that he went missing to the USA. It doesn't corroborate that he was detained. Does the country report talk about how they go out and they grab people and they press them into the service and send them off? Does it talk about that? To be honest, Your Honor, I do not know whether the country report talks about that or not, because the IJ did not consider that in the first instance, nor did the BIA. It looks like the IJ just stopped right at the very beginning. He stopped at the adverse credibility ruling. He said the petitioner was halting. He was uncertain. That didn't fall into absolutely credible, but nor incredible, but for the fraudulent document, which in addition to his inconsistent testimony, his halting manner of speech and his uncertainty, quote, torpedoed his asylum application. Well, a lot of people speak haltingly. Yes, Your Honor, but a lot of people don't testify that their uncle was dead in one case and not dead in another. Well, maybe the IJ scared him. They're sort of fierce looking people. That could be, Your Honor. Where is the forensic report in the record? Forensic report is on page 58 of the record, Your Honor. And it states that. And did the forensic expert have access to the original? I think there's nothing in the record which states exactly that it was the original paper given. All of the evidence in the record suggests that it was the original paper that he was given from the people, which is a Uganda paper that's from Kampala that is printed in English. How was the problem with the English language? Mr. Moyenga? Yes. He said that he preferred to testify in English. There were a lot of indiscernible on the record. A lot of indiscernible. But he said that he had no problem testifying in English. He was given the option of a translator and he denied it. And he was represented by counsel. So that was an informed choice, Your Honor. Now, these inconsistencies, what was the time that lasts between the first statement about the document and the second discussion? The first statements were testified to between pages 145 and 157. What was the difference in time? It was continuous testimony, so there wasn't a time stamp between the two iterations. They're about 45 pages apart on the record. Well, weren't they on different dates? Excuse me. The first testimony was in August of 2000 and the second testimony 10 months later in June of 2001. It didn't continue. The number is continuing, but if you look at the bottom of the transcript page, it indicates the different dates. So the testimony was about 10 months apart. That's correct, Your Honor. Still, the difference between whether your uncle was dead at the time that you called him or not dead at the time and whether you knew the person who delivered you the newspaper or not should not be the type of variations that happen in 10 months. Indeed, on 222 in June, the second time, when he's asked, gee, last August you gave a somewhat different story, and he said, I said the lady brought the paper and left it. I was not at home. So he stuck to his June story but abandoned the August story. That's correct. And his corroborating witness, Mr. Kigo, testified to a little bit different state of facts. He did testify that they were both gone at the time she brought it back, but that the lady was, quote, looking for, you know, all of us, unquote, which is slightly different than both of the iterations that Mr. Moyenga gave. In some, Your Honor, this case ---- Well, if they were liars, they'd, you know, they'd lie in about that. You'd think that they would, a simple thing like how you had to document, they wouldn't follow that up. Unfortunately, we don't have the record of Mr. Kigo's asylum. I believe he was granted asylum based on his application. He didn't actually go through hearing. But as the I.J. presumed, Mr. Kigo probably didn't submit a fraudulent article in his asylum application. What's that? The I.J. noted that Mr. Kigo probably didn't submit a fraudulent document in his asylum application, which would explain the discrepancy between the two. In sum, Your Honors, we have three factors here which support this Court upholding the average credibility determination. First is that there was a fraudulent document that the I.J. said was on its face to the naked eye, fraudulent, and therefore the Petitioner should have had reason to know or question it. In fact, when it was brought to his attention during the hearing, he did question it. Second, that there were a number of inconsistencies in his testimony about how he got a document that he submitted to support the heart of his asylum claim. And third, the corroboration here was reasonable, as the I.J. said, but it was not as extensive as the corroboration in Yemeni. Well, how about his testimony about, you know, being in prison, being tortured and being given a choice between going in the Army or being killed by the snakes? Was there any credibility finding made as to that? The I.J. said it didn't fall in the top 5 percent, where he knew he was believable. It didn't fall in the bottom 5 percent, where he knew he was clearly lying. He said it was kind of a 50-50 case. He was halting and uncertain. He didn't know whether to believe him or not, but that he doesn't believe in sending people back to his country unless it's clear. So he would have given him the benefit of the doubt, but for the fraudulent document. That really went to the heart of the asylum claim. Yes, Your Honor, but so did the newspaper article, because it tended to prove that he was not only detained, and therefore what happened to him during his detention, but that also he was detained because he was a Democrat, which is not corroborated by any other document or testimony on the record. Don't we have that affidavit or that letter from the... Yes, Your Honor, but the letter says that he went missing around a year back, which was the time that he emigrated to this country. So all the letter supports is that he went missing when he emigrated to the United States. It does not... About a year back? The letter was dated August 15, 2000, and he emigrated on September 24, 1999. So about a year back. It's unclear whether that was because he had been detained. How long was he in the Army? He testified that he was in Army training for two weeks, and then the incident he related happened right after he got out of training. Then they ran away, and then he got out of the country. Correct. So that fits, doesn't it? It loosely fits, Your Honor. It's not direct corroboration, much as the newspaper article would have been. Thank you, Your Honor. We'll give you a minute for rebuttal. You know what? What does the country report say about all this? Your Honor, the country report, there were three country reports, and the Amnesty International article submitted as part of Mr. Muyonga's evidence, and they do state that they are apprehended and that they are forced into the military like they were, and that they are tortured, and that they are killed. I mean, the country reports do say all of this, Your Honor. Your Honor, if I may. It's all in the record, huh? Yes, Your Honor. If I may address a case that counsel brought up, the Salami case, and I believe that's a Sixth Circuit case, in which that court, I believe, accepted a newspaper article as their fact-finding on credibility, and I believe that that court did, because there, the newspaper, the court found that it was obvious to anyone that looked at it, and also that the Salami should have realized it and should have done something to find out whether this article was credible or not. In our case, Mr. Muyonga did do something. He did call his uncle. The fact that the uncle dies between the time that he first got the article and the time, the second time when he called him, you know, time had passed. I don't believe there was anything in the record that went to question him of, you know, why did your uncle die during this time, you know, what were the circumstances of his death or anything like that, to corroborate the fact that he was telling the correct story on his uncle. The other is that, in addition, there was, in the case that she cited, there was very little as to other evidence that corroborated the truth. In our case, there was, you know, there was the article, I mean, the letter that he submitted. There was his extensive testimony. I believe in the Salami case there was one incident of beating or torture. In our case, I mean, there was extensive testimony as to what happened to him, you know, how his office was handled. There was a lot of evidence of his, the imputed political opinion that he, that they had because they alleged that he was supporting the allied Ugandan Democrats, and that also the fact that he was working with the orphanage children. So that was his foundation, and that's why the methods of torture were used on him. And the fact that he was given, then induced into their military, and given the opportunity to go without arms, to him, that signified, go, but you're going to be killed there. You have no arm to protect you, and that's in the record. So there was... That's happened in armies before, you know. They don't have enough guns. They've got more people, and they just tell them, you know, go, and, you know, that's what happened. You know, the first person you see that's killed, you just grab their rifle, their ammunition, and keep going. I think that happened during the Revolutionary War. Yes, Your Honor. So I believe in our case there, you know, he did try to find out the source of how this article happened, and try to, and then furthermore, he said he did not knew about the fraud. The Court specifically did not find that he knew about the fraud. Thank you, Your Honors. Thank you. Lateral stand submitted, and we'll go to the next one.
judges: Pregerson, Clifton, Bybee